UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Rabia Hamidani, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>- against -<br><br>Bimbo Bakehouse LLC,<br><br>                        Defendant | 1:22-cv-01026<br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Bimbo Bakehouse LLC ("Defendant") manufactures, labels, markets, and sells "Brown Bread" under The Cheesecake Factory brand (the "Product").



2. The representations include "The Cheesecake Factory At Home," "Our Famous 'Brown Bead,'" "Wheat Sandwich Loaf," "No Artificial Preservatives or Flavors," and a dark-colored loaf of bread with visible pieces of grains on the crust.

### I. CONSUMERS VALUE WHOLE GRAINS

3. Consumers increasingly prefer whole grains to non-whole grains.

4. Whole grains are nutritionally superior to non-whole grains because they include the entire grain seed, consisting of the endosperm, bran, and germ.

5. The bran and germ contain important nutrients like fiber, vitamins, minerals, and antioxidants, such as iron, zinc, folate, magnesium, thiamin, niacin, selenium, riboflavin, manganese, copper, vitamin A, and vitamin B6.

6. The bran also gives whole grains their distinctive brown coloring.

7. In contrast, "non-whole grains" or "refined grains" have been processed to remove the bran and germ, thereby removing the fiber and most other nutrients.

8. Most refined grains are enriched, a process that adds back some of the previously removed iron and B vitamins, such as thiamin, riboflavin, niacin, and folic acid.

9. Other nutrients, including fiber, vitamin E, vitamin B6, vitamin K, magnesium, manganese, potassium, phosphorus, copper, calcium, and selenium, are not added back.

10. Where flour is made of refined grains, which only contains the endosperm and mainly starch, it is white in color ("white flour").

11. The 2015-2020 Dietary Guidelines for Americans recommend that at least half of all grains eaten be whole grains.

12. The Dietary Guidelines recommend consuming 48g of whole grains per day.

A. <u>Consumers Expect Fiber From Products Represented as Whole Grain</u>

13. The average person needs 28 grams of fiber per day.

14. Dietary Guidelines promote whole grains as an important source of fiber.

15. 87% of consumers try to consume more whole grains and 92% try to get more fiber.

16. Research proves that consumers seek whole grains because they want more fiber.

17. In surveys, more than 60% of consumers stated they want to consume more whole grains to improve their digestive health, which is reflective of a desire to increase fiber intake.

18. Almost 75% of consumers who are presented representations which contain express and implied representations that a product is made with, or contains whole grains, will expect that food to be at least a good source of fiber – 10% of the daily value.

19. Almost 70% of consumers agree with the statement that whole grains are one of the best sources of fiber.

20. 62% of consumers agree that foods made from whole grains are one of the best sources of fiber.

21. 46% of consumers rely on foods with whole grains for their daily fiber needs.

22. Based on the proven connection with fiber, consumers expect foods represented – directly or indirectly – as whole grain, do more than tell consumers a product contains a type of grain ingredient.

23. At least half of consumers expect that such foods will be a good source of fiber.

B. <u>Brown Color and Visible Grains</u>

24. Almost half of participants in a recent study incorrectly estimated the whole grain content of grain products, and about the same number overstated the whole grain content of actual whole grain foods.

3

25. According to a food economist and professor at Tufts University, manufacturers have many ways to persuade consumers about a product's whole grain content.

26. Studies have shown that consumers seeking whole grain look for products darker in color with visible grains.

27. This is logical, because refined grains are associated with white bread, which is smooth and even.

28. In contrast to white bread, made from refined grain, bread that is brown with visible grain pieces is expected to be made mainly from whole grains.

29. In a recent study, participants stated, "For me I like to look at the color," and "I like to be able to see the grains" to find out if a bread is mainly whole grain.

30. One of these methods is the addition of coloring from molasses or caramel.

31. Companies also mix distinct pieces of whole grains to their bread, which creates the impression it contains more whole grain flour than it does.

32. One food and nutrition professor stated, "Even people with advanced degrees cannot figure out how much whole grain" is in products represented to consumers as whole grain.

33. The FDA cautioned companies against misleading consumers as to whole grain content of foods, through statements, representations, and omissions.

34. The Food and Drug Administration ("FDA") has established standards of identity for various flours, including a standard of identity for whole wheat flour. 21 C.F.R. § 137.200.

35. However, the FDA recognized that companies could find many ways to mislead consumers as to the amount of whole wheat flour used in grain products.

36. The FDA stated that depending on the context in which a product was represented, directly or indirectly, as whole grain, consumers could likely understand a product is "100 percent

whole grain."

37. The Federal Trade Commission ("FTC") agreed and recognized that many reasonable consumers will likely understand whole grain representations, direct or implied, to mean that all, or virtually all, of the food product is whole grain, or that all of the grain ingredients in the product are whole grains.

38. The recommendation of the FDA was that products marketed as "whole grain," either by representations, omissions, or other methods, not contain non-whole grains.

39. The FDA has warned companies against making misleading whole grain representations, even where the actions merely take advantage of common consumer assumptions, such as through product names, like "HiHo Deluxe WHOLE WHEAT Crackers" and "Krispy WHOLE WHEAT Saltine Crackers," and added coloring to bread to make it look "brown."

II. **PRODUCT NOT WHOLE GRAIN**

40. Despite the labeling of the Product as "Brown Bread," with a dark brown color, and visible pieces of grain, the Product is not made mainly whole grains.

41. This is revealed in part from the fiber content shown on the Nutrition Facts as 1g per serving, or 4% of the Daily Value.



42.     The ingredient list reveals that the most predominant ingredient is not whole grain flour but "ENRICHED WHEAT FLOUR."

**INGREDIENTS:** ENRICHED WHEAT FLOUR (WHEAT FLOUR, MALTED BARLEY FLOUR, NIACIN, REDUCED IRON, THIAMIN MONONITRATE, RIBOFLAVIN, FOLIC ACID), WATER, WHOLE WHEAT FLOUR, SUGAR, BROWN SUGAR, OATS, RYE FLAKES, CONTAINS 2% OR LESS OF EACH: YEAST, WHEAT GLUTEN, VEGETABLE OIL (CANOLA OIL AND/OR SOYBEAN OIL), DRIED MOLASSES [MOLASSES, WHEAT STARCH], WHEAT BRAN, SALT, CULTURED WHEAT STARCH, MALTED BARLEY EXTRACT, CARAMEL COLOR, MALTED BARLEY FLOUR, SOYBEAN LECITHIN, GUAR GUM, MONO AND DIGLYCERIDES, DEXTROSE, ASCORBIC ACID, ENZYMES.

43.     While "WHOLE WHEAT FLOUR" is the third most predominant ingredient, this is less than the second most predominant ingredient of "WATER."

44.     Even if consumers review the ingredients, they will not know what percent of the Product's grains are refined and whole grains.

45.     The Product contains "OATS, [and] RYE FLAKES," added to the exterior.

46. This causes consumers to see these visible grain pieces and expect the Product is made from these whole grain flours, even though their purpose is only visual.

47. The Product contains "DRIED MOLASSES" and "CARAMEL COLOR," which cause the bread to be significantly darker than it would be if the color was based solely on the ratio of refined grains to whole grains.

48. These ingredients contribute to consumers getting the misleading impression the Product contains more whole grains, relative to refined grains, than it does.

49. The Product's name of "Brown Bread" takes advantage of consumer assumptions and beliefs about the darker color of whole grain products.

50. That the name is presented in quotes does not tell consumers the Product is not really brown bread.

51. Instead, the quotes are used to identify the Product as the brown bread typically served to consumers at The Cheesecake Factory restaurants.

## III. CONCLUSION

52. Defendant makes other representations and omissions with respect to the Product which are false or misleading.

53. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

54. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

55. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

56. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

57. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $3.99, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## Jurisdiction and Venue

58. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

59. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

60. Plaintiff Rabia Hamidani is a citizen of Illinois.

61. Defendant Bimbo Bakehouse LLC is an Delaware limited liability company with a principal place of business in Horsham, Montgomery County, Pennsylvania and upon information and belief, at least one member of defendant is not a citizen of the same state as the plaintiff.

62. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

63. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

64. The Product is available to consumers from third-parties, which includes grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

65. Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Cook County, i.e., Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

66. Plaintiff Rabia Hamidani is a citizen of Chicago, Cook County, Illinois.

67. Defendant Bimbo Bakehouse LLC is a Delaware limited liability company with a principal place of business in Horsham, Pennsylvania, Montgomery County.

68. The parent company of Defendant is Bimbo Bakeries, the largest multinational bakery conglomerate in the world.

69. Defendant manufactures, labels, and markets the Product under license from The Cheesecake Factory.

70. Founded in the 1940s, the restaurant which would become The Cheesecake Factory began by only selling cheesecake.

71. Beginning in Los Angeles, the first few Cheesecake Factory restaurants were a hit with the public, who appreciated the diverse menu and freshly prepared meals.

72. As a family business, The Cheesecake Factory focused on foods Americans enjoyed, made with nutrient-rich ingredients that were good for them.

73. The Cheesecake Factory's success resulted in the sale of branded products in supermarkets across the nation.

74. These products carry the brand's name, and reputation for high quality, established from almost a century of success.

75. In numerous polls, The Cheesecake Factory has been the top pick of consumers in

9

the favorite restaurant and food quality category for several years in a row.

76. Consumers presented with Cheesecake Factory-branded products at the supermarket will expect the same level of high-quality and truthfulness they have grown accustomed to.

77. Consumers know they can trust a product with the Cheesecake Factory's name to deliver what it promises, directly or indirectly.

78. The Product is available to consumers from third-parties, which includes grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

79. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Jewel Osco, at locations including 424 W Division St Chicago IL 60610-3190 between August 2021 and October 2021, and/or among other times.

80. Plaintiff believed the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

81. Plaintiff bought the Product because she expected it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did because that is what the representations said and implied.

82. Plaintiff relied on the words, coloring, descriptions, layout, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, and/or claims made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

83. Plaintiff was disappointed because she believed the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it

did.

84. Plaintiff bought the Product at or exceeding the above-referenced price.

85. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

86. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

87. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

88. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

89. Plaintiff is unable to rely on the labeling and representations not only of this Product, but for other similar whole grain products, because she is unsure whether those representations are truthful.

## Class Allegations

90. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Arkansas, Montana, Nebraska, Virginia, Georgia, and Iowa, who purchased the Product during the statutes of limitations for each cause of action alleged.

91. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

11

92. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

93. Plaintiff is an adequate representative because her interests do not conflict with other members.

94. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

95. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

96. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

97. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act<br>("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

98. Plaintiff incorporates by reference all preceding paragraphs.

99. Plaintiff and class members desired to purchase a product that contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

100. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

101. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

102. Plaintiff relied on the representations that the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

12

103. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Violation of State Consumer Fraud Acts

### (On Behalf of the Consumer Fraud Multi-State Class)

104. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

105. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

106. Defendant intended that each of the members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

107. As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

108. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

## Breach of Contract

109. Plaintiff entered into a contract with Defendant for purchase of the Product.

110. The terms of the contract provided that the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

111. Defendant breached the contract because the Product did not meet the terms Plaintiff

agreed to.

112. Plaintiff was damaged by the breach, and those damages include the purchase price.

<u>Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

113. The Product was manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

114. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

115. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

116. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

117. Defendant's representations affirmed and promised that the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

118. Defendant described the Product as one which contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did, which became part of the basis of the bargain that the Product would conform to its affirmations and promises.

14

119. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

120. This duty is based on Defendant's outsized role in the market for this type of Product, the trusted Cheesecake Factory brand, known for transparency, foods with high-quality, nutrient-rich ingredients, and made from scratch.

121. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

122. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

123. Plaintiff hereby provides notice to Defendant that it has breached the express and implied warranties associated with the Product.

124. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

125. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

126. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label.

127. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

128. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Negligent Misrepresentation

129. Defendant had a duty to truthfully represent the Product, which it breached.

130. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the world's largest bakery company, selling products under the trusted Cheesecake Factory brand, known for transparency, foods with high-quality, nutrient-rich ingredients, and made from scratch.

131. Defendant's representations regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that the Cheesecake Factory has been known for.

132. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

133. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

134. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

135. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Fraud

136. Defendant misrepresented and/or omitted the attributes and qualities of the Product,

16

that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

137. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

138. Defendant knew of the issues described here yet did not address them.

139. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

### Unjust Enrichment

140. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;
3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;
4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: February 26, 2022

                                            Respectfully submitted,

                                            /s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com